J-S31025-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DARRYL YOUNG | : | |
| | : | |
| Appellant | : | No. 3041 EDA 2022 |

Appeal from the PCRA Order Entered November 23, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0005703-2011

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DARRYL YOUNG | : | |
| | : | |
| Appellant | : | No. 3042 EDA 2022 |

Appeal from the PCRA Order Entered November 23, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0015810-2010

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DARRYL YOUNG | : | |
| | : | |
| Appellant | : | No. 3043 EDA 2022 |

Appeal from the PCRA Order Entered November 23, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0005704-2011

BEFORE: OLSON, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY STABILE, J.:                    **FILED SEPTEMBER 2, 2025**

Appellant, Darryl Young, who is serving two consecutive life sentences plus 50-100 years' imprisonment for two first-degree murder convictions and other offenses, appeals from an order dismissing his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. We affirm.

The charges in this matter stem from Appellant's arrest for three shooting incidents in Philadelphia in 2009. The trial court set forth the relevant facts of those cases as follows:

> On September 24, 2009, around 2:39 p.m. on the 1300 block of North 56th Street in Philadelphia, Kevin Hubbard Jr. and Allen Thompson were walking to the corner deli to pick up lunch when they noticed [Appellant] approaching them on a bicycle. Hubbard and Thompson retreated as [Appellant] approached, with Hubbard beginning to enter his aunt's home and Thompson going to the door of a friend who lived next door to Hubbard's aunt. Before either Hubbard or Thompson could enter the homes, [Appellant] reached into his pants and withdrew a black firearm, pointing it at both Hubbard and Thompson. [Appellant] then began shooting at Hubbard before turning to shoot at Thompson, firing multiple times. [Appellant] then fled the scene on his bike. Also present at the scene of the shooting was Ernest Howard, Jr.
>
> Responding police officers found Hubbard lying on the porch and immediately placed him in the back of a police car, rushing him to the Hospital of the University of Pennsylvania ("HUP"). Hubbard was pronounced dead at HUP at 3:29 p.m. Hubbard died from a gunshot wound to the chest, where the bullet penetrated his left lung, pulmonary artery, heart, diaphragm, stomach, and left kidney. Thompson was struck by a bullet in the interior of his right bicep. Thompson was also transported to HUP, where he underwent surgery. As a result of the gunshot wound, Thompson suffered from sustained nerve damage.

Police recovered six fired cartridge cases in front of 1337 North 56th Street. Two bullets were also recovered from the 1339 North 56th Street home: one from the floor inside of the house and one from the doorjamb. Subsequent analysis revealed that all of the fired cartridge cases were fired from the same weapon.

On October 26, 2009, at approximately 6:15 p.m., David Bowen, Christopher Bolger, and Derrick Bolton were walking on Master Street between 56th Street and 57th Street in Philadelphia, returning from school. Howard was also present at the time. Bolger noticed [Appellant], with two other males, walking across the street, wearing hoodies. Bowen noticed [Appellant] approach from behind, pull a firearm from his pants, and begin to shoot.

Bowen was shot once in his left arm and once in his left leg. Bolger was shot in the stomach, back, and chest. Bolton was shot in his left calf. All victims were transported to HUP for medical treatment. While still receiving treatment in the hospital, Bolger identified [Appellant] as the individual who had shot him. At the time that [Appellant] shot Bolger and Bolton, he was attempting to shoot Ernest Howard Jr., who was present at the first shooting and had told Bolger that [Appellant] "was going to kill [Howard] because [he] knew too much."

Police recovered a nine millimeter semiautomatic handgun at the scene of the shooting, as well as fourteen fired cartridge cases. Subsequent analysis of the cartridge cases revealed that five were fired from the firearm recovered at the scene, nine were fired from an unrecovered nine millimeter firearm, and one was fired from an unrecovered .40 caliber firearm.

On October 27, 2009, the day after the second shooting, at approximately 7:00 p.m., Howard and Ernest Winston were driving ... near 57th Street and Master Street when Howard noticed a friend walking on the street and pulled over to talk to him. Howard exited the vehicle in order to talk to the person at the front of the car while Winston remained inside. Winston exited the vehicle in order to get a light from Howard and then returned to the vehicle. Upon returning to the vehicle, Winston heard multiple gunshots coming from behind the vehicle and ducked for cover. Winston then looked behind him and saw [Appellant] with a silver gun in his hand. Howard ran across the street towards a bar and collapsed on the street. Winston ran after Howard and, after noticing blood on the street, went to a house on Frazier Street to try to get help.

Responding police officers located Howard face down on the ground. Police immediately placed Howard in a patrol car and rushed him to HUP. Howard was alive at the time police arrived but was pronounced dead at 8:58. Howard suffered a penetrating gunshot wound to his right torso, which pierced his liver, stomach, intestines, pancreas, vena cava, spleen, diaphragm, and left lung. The bullet was recovered as part of medical intervention and provided to police.

Winston later told police that Howard was friends with Thompson, who was shot by [Appellant] in the first shooting, and that [Appellant] wanted to kill Howard because Howard knew about [Appellant] shooting Thompson.

Subsequent analysis of a bullet hole in Howard's car showed that the damage was consistent with the car having been struck from a shooter standing in the alley behind the vehicle. Bullet fragments were recovered from the interior of the car. Police also recovered five .45 caliber fired cartridge cases from the alley behind the vehicle. One .45 caliber bullet was recovered from Howard and a .45 caliber bullet fragment was recovered from the scene. Subsequent analysis of the fired cartridge cases revealed that all were fired from the same firearm.

Trial Court Opinion, 9/29/2015, at 2-6 (citations and footnotes omitted).

The three cases were consolidated for a capital trial. Mia Perez, Esquire[1] and Regina Coyne, Esquire represented Appellant during trial. On January 16, 2015, the jury found Appellant guilty of two counts of first-degree murder for killing Hubbard and Howard and multiple counts of attempted murder, aggravated assault, prohibited person carrying a firearm, carrying a firearm without a license, carrying a firearm on a public street in Philadelphia, and

_____

[1] Subsequent to the PCRA evidentiary hearing in these cases, Perez became a judge on the Court of Common Pleas of Philadelphia County. She is now a judge on the United States District Court for the Eastern District of Pennsylvania.

possession of an instrument of crime.[2]  On January 21, 2015, following a penalty phase hearing, the jury returned a verdict of life imprisonment on both first-degree murder convictions.  The court immediately imposed a sentence of two consecutive terms of life imprisonment followed by 50-100 years' imprisonment on the remaining counts.  On May 18, 2015, the court denied Appellant's timely-filed post-sentence motions.  On direct appeal, this Court affirmed Appellant's judgment of sentence, and our Supreme Court denied Appellant's petition for allowance of appeal on February 15, 2017.

On August 23, 2017, Appellant filed a timely *pro se* PCRA petition.  The court appointed James Lammendola, Esquire to represent Appellant. Lammendola filed a letter pursuant to **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988), stating there was no merit to Appellant's claims for relief ("**Finley** Letter").  On January 26, 2018, the court accepted Lammendola's **Finley** Letter on all but two issues, a claim that trial counsel failed to call an alibi witness and a claim that trial counsel interfered with Appellant's right to testify.  Lammendola filed an amended PCRA petition, arguing trial counsel was ineffective for misinforming Appellant regarding his right to testify.  Lammendola then filed a supplemental amended petition arguing that trial counsel was ineffective for failing to call alibi witness Zakeya

_____

[2] 18 Pa.C.S.A. §§ 2502, 901, 2702, 6105, 6106, 6108, and 907, respectively.

Kelly. The Commonwealth filed responses to Lammendola's filings, and the court granted a hearing on both claims.

In February 2019, Lammendola passed away, and the court appointed Stephen O'Hanlon, Esquire to represent Appellant. O'Hanlon filed a petition and memorandum incorporating Lammendola's claim regarding Appellant's right to testify. O'Hanlon also raised an after-discovered evidence claim regarding the misconduct of former Philadelphia Police Detective Phillip Nordo.[3]

Michael Pileggi, Esquire entered his appearance on behalf of Appellant as privately retained counsel. Pileggi filed a second amended PCRA petition raising both ineffective assistance of trial counsel claims and the after-discovered evidence claim. The Commonwealth responded to the second amended petition on April 29, 2020, arguing that Appellant's after-discovered evidence claim was not fully developed because it lacked a witness certification or affidavit from trial witness Ernest Winston. Pileggi supplemented his second amended petition by filing Winston's affidavit. On December 15, 2020, the PCRA court denied Appellant's after-discovered evidence claim regarding

_____

[3] The Commonwealth notes that on June 1, 2022, Detective Nordo was found guilty of multiple counts of rape, sexual assault, stalking, and official oppression at docket number CP-51-CR-0001856-2019. The evidence presented at Nordo's trial established that he sexually assaulted male witnesses and informants in homicide cases where he was involved as a detective, and that he illegally procured crime reward money for one of the victims.

Detective Nordo but granted an evidentiary hearing regarding trial counsel's interference with Appellant's right to testify and failure to call an alibi witness.

On April 11, 2022, and November 23, 2022, the PCRA court held evidentiary hearings on Appellant's claims of ineffective assistance. At the conclusion of the hearings, the court rendered findings of fact and conclusions of law and entered an order dismissing Appellant's petition. Immediately following the dismissal, Pileggi moved to withdraw. The court granted Pileggi's motion and appointed new counsel, George Yacoubian, Esquire, to represent Appellant on appeal. Yacoubian filed a notice of appeal on November 29, 2022, and a Pa.R.A.P. 1925(b) statement on December 11, 2022.

On June 22, 2023, Appellant filed a *pro se* motion with this Court requesting a remand for a hearing under **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998), or the appointment of new counsel. Appellant also indicated that he wished to argue ineffective assistance of PCRA counsel. In a second filing, Appellant specified that he believed PCRA counsel was ineffective for not consulting with him before filing a Pa.R.A.P. 1925(b) statement and for not arguing trial counsel's ineffectiveness for failing to object to a jury instruction on conspiracy and accomplice liability when he "[was not] charge[d] with either." Letter in Application to Amend Motion for **Grazier** Hearing with Exhibits, 6/30/23, at 1.

On October 30, 2023, this Court remanded the case for the PCRA court to conduct a **Grazier** hearing and to address Appellant's claim of ineffective

assistance of PCRA counsel. Order, 10/30/23 at 2. The PCRA court appointed new counsel, who filed a supplemental Rule 1925(b) statement alleging that trial counsel was ineffective for failing to object to jury instructions. Supplemental Pa.R.A.P. 1925(b) Statement, 5/6/24, at 1. On May 23, 2024, the PCRA court filed a supplemental 1925(a) Opinion in which it determined that the jury instruction issue lacked merit.

On February 19, 2025, Appellant filed a supplemental appellate brief in this Court. In this brief, Appellant abandoned his claim for which the case was remanded: PCRA counsel's alleged ineffectiveness for not raising trial counsel's ineffectiveness for not objecting to the jury instructions regarding conspirator and accomplice liability.

On June 27, 2025, this Court affirmed the PCRA court's order in a memorandum decision. On July 2, 2025, Appellant filed a motion to vacate this decision on the ground that this Court had granted him an extension until June 27, 2025 (the same day we issued our memorandum decision) to file a reply brief, and that his attorney was preparing to file the reply brief when he received our memorandum decision. On July 15, 2025, we vacated our memorandum decision and ordered Appellant to file his reply brief within ten days. On July 25, 2025, Appellant filed his reply brief, making this case ripe for disposition.

Appellant raises the following issues in this appeal:

1. Where there was an alibi witness who would have served to debunk Appellant's involvement in the initial shooting in this case,

- 8 -

from which arose the motive for the second and third shootings, was counsel ineffective for failing to present this witness?

2. Where [Appellant] could have testified that the intended victim in the second and third shootings was a friend of his whom he would have never killed or sought to kill, was counsel's basis for advising [Appellant] not to testify reasonable, even if it could possibly have shown that he had a prior weapons conviction?

3. Where a claim was presented as to misconduct by Detective Philip Nordo, a homicide detective who has a pattern and practice of misconduct and has been convicted of misconduct and abusing witnesses and taking their statements, did the lower court err in not holding a hearing as to this claim when there was a genuine issue of material fact under Pa.R.Cr[im].P. 907?

Appellant's Supplemental Appellate Brief at 3.

"On appeal from the denial of PCRA relief, our standard of review requires us to determine whether the ruling of the PCRA court is supported by the record and free of legal error." *Commonwealth v. Widgins*, 29 A.3d 816, 819 (Pa. Super. 2011). As this Court has explained:

We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. Further, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary.

*Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012) (citations omitted). When a petitioner asserts an ineffectiveness claim, he is entitled to relief if he pleads and proves that prior counsel rendered ineffective assistance

of counsel.  42 Pa.C.S.A. § 9543(a)(2)(ii).  "To prevail on an [ineffectiveness] claim, a PCRA petitioner must plead and prove by a preponderance of the evidence that (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for acting or failing to act; and (3) the petitioner suffered resulting prejudice."  **Commonwealth v. Reyes-Rodriguez**, 111 A.3d 775, 780 (Pa. Super. 2015) (*en banc*).  "A petitioner must prove all three factors of the [ineffectiveness] test, or the claim fails."  **Id.**  A failure to satisfy any one of the three prongs of the test for ineffectiveness requires rejection of the claim.  **Commonwealth v. Cook**, 952 A.2d 594, 614 (Pa. 2008).  "The burden of proving ineffectiveness rests with [the petitioner]."  **Commonwealth v. Chmiel**, 889 A.2d 501, 540 (Pa. 2005).

Appellant argues that the PCRA court erred by denying his claim that trial counsel was ineffective for failing to investigate and call alibi witness Zakeya Kelly.  We disagree.

When raising counsel's ineffectiveness for failure to call a witness, the PCRA petitioner must establish that:

> 1) the witness existed; 2) the witness was available to testify for the defense; 3) counsel knew of, or should have known of, the existence of the witness; 4) the witness was willing to testify for the defense; and 5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

**Commonwealth v. Johnson**, 966 A.2d 523, 536 (Pa. 2009).  However, the failure to call a witness "is not per se ineffective assistance of counsel, for such decision implicates matters of trial strategy.  It is the petitioner's burden to

demonstrate that trial counsel had no reasonable basis for declining to call a particular person as a witness." ***Commonwealth v. Hammond***, 953 A.2d 544, 558 (Pa. Super. 2008). "With respect to the specific claim of an alibi defense ... such a defense places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party. All that is required is that, due to separation, it is impossible for the defendant to have committed the crime." ***Commonwealth v. Dennis***, 17 A.3d 297, 302 (Pa. 2011) (citations and quotation marks omitted).

During the PCRA evidentiary hearings, Appellant, Kelly and Perez (trial counsel) testified on Perez's alleged failure to call Kelly as a witness. Kelly testified that she was with Appellant on September 24, 2009, the date of Thompson's and Hubbard's shooting. N.T., 4/11/2022, at 14-15. Kelly claimed that she met Appellant at her grandmother's house around 12:15 p.m., and they sat outside for a while before going in the house to eat, watch a movie and have sex. ***Id.*** at 15. Appellant left just before 5:00 p.m. ***Id.*** Kelly recalled this encounter with Appellant because, at the time, she kept a diary containing the names of anyone she had sex with as well as the date in case she became pregnant. ***Id.*** at 16. She claimed that she lost the diary in 2019. ***Id.*** at 26.

Kelly testified that "someone" called her around 2011 and told her that Appellant was in jail. ***Id.*** at 31-32. She could not remember if the caller was

male or female, and the person simply stated that he or she was someone working on the case. *Id.* at 33. The person told Kelly that Appellant wanted her to testify on his behalf at his trial. *Id.* at 31-32. Kelly claimed that she never followed up, and nobody contacted her again about the case until 2018. *Id.* at 32.

Perez testified that, upon her appointment as counsel, she obtained Appellant's case file from prior counsel, and she and her staff went to work organizing discovery to ensure nothing was missing. N.T. 11/23/2022 at 9-11. She made at least two separate trips to the district attorney's office to ensure she had complete discovery. *Id.* at 11. She met with Appellant a minimum of 25 times but potentially closer to 30 or 40 times. *Id.* at 13. At no point during these meetings did Appellant tell her he had an alibi. *Id.* at 15-16. Perez did not recall Appellant telling her he could not have committed the September 24, 2009, shooting because he was having sex with someone that day; nor did she recall Appellant mentioning the name Zakeya Kelly. *Id.* at 17-18, 28-29. Perez had no specific recollection of Appellant ever using the word "alibi." *Id.* at 16.

Perez explained that she never had a conversation with any of her staff or co-counsel about Appellant having an alibi. *Id.* at 15. Had she known about a potential alibi, she would have investigated it. *Id.* at 16. Moreover, had she been given Kelly's contact information, she would have given it to her investigator to follow up and, if the investigation was successful, she would

have scheduled an in-person meeting with Kelly. *Id.* at 18-19. Had there been a viable alibi defense, she would have "absolutely" put on evidence of the alibi, because they were "fighting for [Appellant's] life." *Id.* at 16.

Appellant testified that on September 24, 2009, he arrived at Kelly's house around noon. They eventually went into the house where they watched a movie, she cooked, and they had sex. N.T., 4/11/2022, at 51. He left around "four something." *Id.* He claimed that he told Perez prior to trial that he wanted to present Kelly as an alibi witness, but Perez failed to do so. *Id.* at 38. Appellant testified that he told Perez about his alibi both prior to trial and two weeks into trial, and Perez stated she would investigate it. *Id.* at 49. Appellant stated that he did not continue to raise his alibi with Perez thereafter because he did not understand trial procedures. *Id.* at 50. Furthermore, Appellant stated that he omitted Kelly from his initial *pro se* PCRA petition because the person who typed it up forgot to put her name in the petition even though he had told the person to include it. *Id.*

At the conclusion of the PCRA hearings, the PCRA court found Perez credible on the alibi issue. N.T. 11/23/2022 at 46. The court considered her preparation for the trial was "top of the line" and stated that she was "extraordinarily diligent" in her representation. *Id.* at 46-47. The court found it inconceivable that Perez would not have investigated a potential alibi witness had one been identified. *Id.* at 47. The court credited Perez's testimony that she had no recollection of anybody ever mentioning an alibi to

her during the case. *Id.* The court found as a fact that no one had identified any potential alibi witness to Perez. *Id.* at 47-48.

The record supports the PCRA court's credibility determinations, so this Court is bound by them. *Ford*, 44 A.3d at 1194. We are bound by the PCRA court's finding that nobody identified any potential alibi witness to Perez. Accordingly, Appellant's claim of ineffectiveness lacks merit.

In his supplemental appellate brief, and again in his reply brief, Appellant advances a new theory. No longer claiming that he told Perez about Kelly, he now argues that Perez "should have known to inquire about an alibi." Supplemental Brief for Appellant at 18. In other words, Appellant claims Perez was ineffective for not asking him whether he had an alibi, even though she had no reason to believe one existed. Appellant did not raise this argument during the PCRA hearing; instead, he testified there that he had told Perez about Kelly, but Perez failed to call her as a witness. N.T., 4/11/22, at 38. The Commonwealth contends, and we agree, that Appellant waived this argument by failing to raise it below. *See* Pa.R.A.P. 302(a). Even if Appellant preserved this argument for appeal, Appellant's counsel during the PCRA hearing[4] had good reason not to raise this argument, because it would have contradicted Appellant's testimony that he told Perez about Kelly.

_____

[4] Appellant is represented in this appeal by a different attorney than the attorney who represented him during the PCRA hearing.

In his second ineffectiveness claim, Appellant contends that Perez misled him into declining to testify by advising him that he would be impeached through his prior drug and gun convictions if he took the stand. Appellant argues that this was erroneous advice because drug and gun convictions are not *crimen falsi* and therefore could not be used to impeach him. He further argues that his testimony was essential to his defense because he would have emphasized that one of the decedents, Ernest Howard, was his friend, and therefore he had no reason to shoot him. The PCRA court properly rejected this argument.

The decision whether to testify belongs solely to the defendant. ***Commonwealth v. Nieves***, 746 A.2d 1102, 1104 (Pa. 2000). To establish that counsel was ineffective for advising the defendant not to testify, the PCRA petitioner must show either that "counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf." ***Id.***

During the PCRA evidentiary hearing, Perez testified that at the time of Appellant's trial, roughly 80-85 percent of her practice was in criminal defense, in both state and federal courts. Perez was certified to handle capital cases and had experience with death penalty cases prior to Appellant's case. As part of her trial preparation, she rehearsed by questioning Appellant as if she were the prosecutor. Ultimately, she recommended that he not testify, because she was worried about Appellant's temperament, demeanor, and lack

of emotion. She had concerns that he would come off as dispassionate or cold, that he would have trouble sticking to the facts, and that he would lose his temper with the prosecutor. N.T., 11/23/22, at 7–8, 20–24. When asked about Appellant's prior VUFA and drug convictions, Perez recognized that they were not *crimen falsi*. She explained that she advised Appellant that they could potentially be admitted for impeachment, but only if Appellant opened the door by testifying, for example, that he had never possessed a firearm (a representation he made to Perez despite his prior VUFA conviction). Perez testified that she based her advice less on the potential for impeachment and more on Appellant's demeanor and her concern that the jury would not find him a favorable witness. She testified that notwithstanding her professional advice, if Appellant had wanted to testify, she would have called him as a witness, as "that is a decision he ultimately makes, 110 percent." *Id.* at 22–23, 26–27, 32.

Appellant testified during the PCRA hearing that he told Perez he wanted to testify during trial that he did not participate in the murders, and that he had no motive to kill Howard because Howard was his friend. N.T., 4/11/22, at 41. He testified that Perez advised him she did not think it was a good idea because "they're going to bring the drugs and gun up for impeachment." N.T., 4/11/22, at 39–40.

The PCRA court explicitly credited Perez's testimony that she correctly advised Appellant that his prior gun and drug convictions were not *crimen falsi*

but might become admissible if he opened the door. The PCRA court also found Appellant's testimony incredible. Since the record (more specifically, Perez's testimony) supports these credibility determinations, this Court is bound by them. ***Ford***, 44 A.3d at 1194. The evidence that the PCRA court found credible (Perez's testimony) establishes that Appellant's claim lacks arguable merit and that Perez had a reasonable basis for counseling Appellant not to take the stand during trial.

Appellant's claim also fails because he knowingly, intelligently, and voluntarily waived his right to testify prior to trial. "It is well settled that a defendant who made a knowing, voluntary, intelligent waiver of testimony may not later claim ineffective assistance of counsel for failure to testify." ***Commonwealth v. Lawson***, 762 A.2d 753, 755 (Pa. Super. 2000); ***see also Commonwealth v. Fletcher***, 750 A.2d 261, 274–75 (Pa. 2000) (ineffectiveness claim meritless where court conducted colloquy concerning appellant's right to testify and he stated he had discussed his right to testify with counsel and it was his decision to waive that right); ***Commonwealth v. Hall***, 701 A.2d 190, 206 (Pa. 1997) (ineffectiveness claim regarding appellant's right to testify "[rang] hollow since he twice made a knowing, intelligent, and voluntary waiver of his right to testify").

During trial, the court conducted a thorough colloquy in which Appellant knowingly, intelligently, and voluntarily represented that it was his own decision not to testify. Appellant did not state during this colloquy that he

wanted to testify but that he was told not to because he would be impeached through his prior convictions. N.T., 1/15/15, at 145–48. Since Appellant knowingly, voluntarily and intelligently waived his right to testify, he cannot now assert that Perez was ineffective for his decision not to testify.

In his third and final argument, Appellant claims that the PCRA court erred when it denied his after-discovered evidence claim regarding the arrest of former Philadelphia Police Detective Phillip Nordo. In support of this claim, Appellant submitted an affidavit by Ernest Winston,[5] a witness during Appellant's trial, that a "fat short white guy" (Detective Nordo) threatened to charge him with Howard's murder unless he signed a pre-written statement and identified Appellant as the shooter. The PCRA court properly rejected this argument.

Shortly after the second shooting, Winston gave police a statement inculpating Appellant as the shooter. At trial, however, Winston vehemently denied identifying Appellant as the shooter. He claimed that he never met Appellant, did not see him at the scene of the murder, and did not see who shot Howard. Winston further claimed that detectives coerced him into selecting Appellant as the shooter by threatening to charge him with Howard's

---

[5] Although we cannot find the affidavit in the certified record, it is in Appellant's reproduced record at pages 349-354, and the Commonwealth appears to concede that Appellant filed this affidavit during proceedings in the PCRA court. Accordingly, for purposes of this decision, we deem the affidavit properly filed in the certified record.

homicide if he did not. Detective McDermott, however, testified that Winston's statement was a verbatim recording of Winston's words, and that Winston identified Appellant without any assistance or encouragement.

In his claim of after-discovered evidence, Appellant asserts that Detective Nordo, one of the detectives present during Winston's statement, obtained a fabricated statement and identification from Winston through coercion. In 2022, Nordo was convicted of multiple counts of rape, sexual assault, stalking, and official oppression. Appellant contends that the verdict would have been different had the jury known about Nordo's arrest and convictions.

After-discovered evidence will give rise to relief when the proponent can "demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted." **Commonwealth v. Crumbley**, 270 A.3d 1171, 1178 (Pa. Super. 2022); **see also** 42 Pa.C.S.A. § 9543(a)(2)(vi). Failure to satisfy any one prong is fatal to the claim. **Commonwealth v. Solano**, 129 A.3d 1156, 1180 (Pa. 2015) ("[a]s this test is conjunctive, failure to establish one prong obviates the need to analyze the remaining ones").

Appellant asserts that Detective Nordo's corruption conviction and Winston's affidavit constitutes after-discovered evidence that Detective Nordo

coerced a statement from Winston that was admitted at trial and incriminated Appellant. For multiple reasons, we disagree.

For the most part, Winston's affidavit is not after-discovered evidence, because it is largely a recitation of his trial testimony. Winston claimed at trial that his statement was fabricated and that he never identified Appellant as the shooter. His affidavit said much the same thing.

Winston's affidavit also includes allegations that he raised for the first time, such as his allegation that the detectives approached him before trial and told him that if he did not testify in accordance with his statement, he would be in violation of his probation and would go to jail. It is unlikely, however, that this new detail would have resulted in a different verdict. During trial, Winston testified that the detectives threatened to charge him with murder if he did not give a statement inculpating Appellant. Winston's trial testimony that the detectives threatened to charge him with murder was a far more heinous accusation against the detectives than the claim in Winston's affidavit that the detectives threatened to revoke his probation. Since the jury found Appellant guilty of murder despite Winston's more heinous accusation, it is difficult to see how the less heinous accusation in his affidavit would have affected the verdict.

In addition, Winston's affidavit includes new variations on facts that he testified to at trial—for example, Howard pulled over to talk to two girls, not a man, and he only saw one person running away after the shooting, not two.

We cannot see how these relatively minor differences between Winston's trial testimony and his affidavit would have changed the verdict.

Furthermore, it bears emphasis that Winston's statement did not arise from a one-on-one confrontation between Detective Nordo and Winston in which Detective Nordo coerced Winston into giving a false statement. The record shows that Detective McDermott and Detective Nordo were both present during Winston's interview. Unlike Detective Nordo, Detective McDermott testified at trial, stating that he interviewed Winston in 2009 along with Detective Nordo. N.T., 1/12/2015, at 207-08. Detective McDermott stated that he was the detective who actually took Winston's statement and wrote down Winston's answers verbatim in the statement. *Id.* at 216, 229. Detective McDermott stated that Winston immediately identified Appellant because Winston stated that he knew Appellant, *id.* at 221, and at the time detectives took Winston's statement, no one had identified Appellant as the shooter. *Id.* at 210-11.

In addition, Appellant fails to demonstrate any misconduct by Detective Nordo in the present case. Detective Nordo did not take Winston's statement; Detective McDermott did. There were no misconduct allegations raised in this case regarding Detective McDermott. Nor did Detective Nordo testify during Appellant's trial. The after-discovered evidence of Detective Nordo's conviction concerns his misconduct in different cases. This evidence would not likely result in a different verdict if a new trial were granted. *See*

*Commonwealth v. Cartegena*, 2021 WL 5564054, at *8 (Pa. Super., Nov. 29, 2021) (unpublished memorandum)[6] (holding in another PCRA appeal that after-discovered evidence claim of Detective Nordo's conviction lacked merit, where, as in present case, Detective Nordo was one of two detectives present during witness's statement, the other detective took the statement and testified during trial, Detective Nordo did not testify during trial, and Detective Nordo's misconduct was totally unrelated to the case on appeal).

In his supplemental appellate brief, Appellant claims that the court abused its discretion by denying relief on his after-discovered evidence claim without an evidentiary hearing. Supplemental Appellate Brief for Appellant at 26. "A PCRA hearing is not a matter of right, and the PCRA court may decline to hold a hearing if there is no genuine issue concerning any material fact and the defendant is not entitled to relief as a matter of law." *Commonwealth v. Morrison*, 878 A.2d 102, 109 (Pa. Super. 2005) (*en banc*). For the reasons given above, we conclude that Appellant's claim of after-discovered evidence did not raise a genuine issue concerning any material fact. Therefore, Appellant is not entitled to relief as a matter of law.

For these reasons, the PCRA court properly dismissed Appellant's PCRA petition.

Order affirmed.

_____

[6] *See* Pa.R.A.P. 126(b) (nonprecedential decisions of Superior Court filed after May 1, 2019 may be cited for their persuasive value).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/2/2025